CASE 70—PETITIONS EQUITY—MAY 23, 1896.

# City of Louisville v. Southern Baptist Theological Seminary,

# Southern Baptist Theological Seminary v. Claggett, Sheriff.

THE FIRST NAMED APPEAL FROM THE JEFFERSON CIRCUIT COURT, LAW
AND EQUITY DIVISION, AND THE LAST NAMED FROM THE GRAYSON
CIRCUIT COURT.

1. TAXATION—EXEMPTION OF CHARITABLE AND EDUCATIONAL INSTITU-
TIONS—CONSTITUTIONAL CONSTRUCTION.—A theological seminary,
the object of which is to furnish free of charge educational facili-
ties to young men studying or preparing for the Christian minis-
try, and which does not refuse to accept young men, so studying
or preparing, from any denomination, is a purely public charity
within the meaning of section 170 of the Constitution. And while
the management and organization of the institution may be pri-
vate and denominational, the charity administered is purely public.

LAF. JOSEPH FOR APPELLANT.

(Brief same as in case of Trustees of Kentucky Female Orphan
School v. City of Louisville.)

R. LEE SUTER, SPECIAL COUNSEL FOR COMMONWEALTH OF KENTUCKY.

1. The amendment to the charter of the Southern Baptist Theological
Seminary, under which it claims exemption by reason of a con-
tract therein, is unconstitutional, and was when it was passed,
because it provides that the exemptions shall continue in force
"so long as said seminary shall not make any charge for tuition
to persons of any denomination of Christians studying or pre-
paring for the ministry."
    This provision excludes from the benefits of the school all those
other than "Christians" and gives a preference to those of one
religious belief, or mode of worship, over others. (See Kentucky
Constitution of 1849.)

2. The Southern Baptist Theological Seminary is purely a denomin-
ational institution. Its articles of faith which are required to be
taught in the seminary virtually exclude from the institution all

persons not studying for the Baptist ministry, and practically null-
ify the rule allowing students of other denominations to attend
the school free of charge, and positively exclude all persons of the
Jewish faith and all persons who are not studying for the Chris-
tian ministry.

3. The Southern Baptist Theological Seminary is not a "purely pub-
lic charity" because all persons not "studying or preparing for the
Christian ministry" are positively and absolutely barred from it
by the terms of its charter; and its articles of faith go further
and positively exclude all persons not studying or preparing for
the Baptist ministry, which is a very small component part of "the
Christian ministry," which is still only a component part of "the
ministry."

4. While this is a Christian country and the Christian religion has been
held to be a part of the law of the land, that doctrine has never
been recognized to such an extent that it will permit the property
of a non-believer to be appropriated against his consent, to sup-
port the Christian ministry. To exempt that property and there-
by increase the general burden of taxation, would be to appropri-
ate the property of a Jew to the support of a school which no Jew
can enter at all.

5. By the act of 1856 the Legislature reserved the right to repeal all
charters and grants thereafter given unless "a contrary intent is
thereby plainly expressed;" and the amendment to the charter
of the Kentucky Female Orphan School under which it claims a
contract of exemption was passed March 11, 1862, and was there-
fore enacted subject to repeal. And as it contains nothing to in-
dicate that the Legislature intended to surrender the right to re-
peal it, it was repealed by sections 3 and 170 of the present Consti-
tution of Kentucky.

6. The Board of Trustees of the Kentucky Female Orphan School
under its charter must be composed of "members in good stand-
ing of some congregation of Christ's Church in Kentucky," and
have the power to "judge of the age and circumstances entitling
(pupils) to admission" and to determine the number that shall
at any time be admitted and prescribe the time each beneficiary
may remain in the institution. This, it appears, makes the in-
stitution purely sectarian, and not public in any sense. It is, at
any rate, a select or private school. (City of Henderson v. Mc-
Cullough, 89 Ky., 448.)

7. In any event, the exemption can only apply to the school buildings
proper, furniture and outhouses—those used strictly in connec-
tion with the conduct of the schools, and necessary to the proper
conduct thereof; and not to the property owned by the institu-

tion, remote from it and not used by it in the conduct of education. And it is immaterial that the income from such remote property is used in carrying out the purposes of the institution. (Louisville v. Board of Trade, 90 Ky., 409; Appeal Tax Court v. Grand Lodge, 50 Md., 421; Frederick Co. v. Sisters of Charity, 48 Md., 34; Chapel of Good Shepherd v. Boston, 120 Mass., 212; Pierce v. Cambridge, 2 Cushing, 611; Morris v. Chapter of Masons, 68 Texas, 698; Bank v. Tennessee, 104, U. R., 492; Desty on Taxation, Vol. 1, p. 119.)

8. St. Xavier's College and the Nazareth Literary and Benevolent Institution and its branches, will each be found upon examination of the pleadings and evidence to be private institutions, controlled and operated for private gain and profit.

HUMPHREY AND DAVIE FOR THE SOUTHERN BAPTIST THEOLOGICAL SEMINARY.

1. The provisions of the charter of the seminary, that all of its property should be exempt, that the exemption should have perpetual continuance, and should continue in full force as long as the seminary should not make any charge for tuition, was a contract; which the Federal and State Constitutions protected from subsequent impairment. (Acts 1876, Vol. 1, 317; Acts 1879, Vol. 1, 676; Acts 1883-4, vol. 2, 267; Acts 1877-8, vol. 3, 763; Acts 1889-90, vol. 3, 238. Northwestern University v. People, 99 U. S. 309; Washington University v. Rouse, 8 Wallace, 439; Asylum v. New Orleans, 105, U. S., 369; Home of the Friendless v. Rouse, 8 Wallace, 430; Louisville Gas Co. v. Citizens' Gas Co., 115 U. S., 697; New Jersey v. Yard, 95 U. S., 104; Henderson (Ky.) v. Strangers Rest (Ky.), 17 Southwestern, 215; Commissioners v. Green & Barren River Co., 79 Ky., 73; Commonwealth v. Railroads, 95 Ky., 60; Franklin Co. v. The Banks, 87 Ky., 388; Louisville R. R. v. Commonwealth, 10 Bush, 47; Johnson v. Commonwealth, 7 Dana, 343; Commonwealth v. Farmers' Bank, 6 Bush, 127; Bank Tax Cases, 17 Kentucky Law Reporter, 465; St. Vincent College v. Collector, 104 Mo., 267; Farrington v. Tennessee, 95 U. S., 682.)

2. The policy of Kentucky has always been not to tax the endowments of educational institutions, that are not operated for private profit, but merely to support the institution. (2 Moorehead & Brown's Statutes, 1080; Revised Statutes of 1852, chap. 58, art. 1, sec. 1; General Statutes of 1873, chap. 92, art. 1, sec. 3; Hewitt Revenue Act of 1886, Gen. Stat., ed. 1888, chap. 92, art. 1, sec. 9.)

3. The Constitution of 1849, as interpreted by the Revised Statutes immediately enacted to put it into effect, did not intend to change this settled policy. (Rev. Stat., chap. 58, art. 1, sec. 1; Collins v.

Henderson, 11 Bush, 75; The Laura, 114 U. S., 416; Higgins v. Prater, 91 Ky., 18.)

4. The exemption being of "all" the property belonging to the institution; with a requirement that all its endowments and income shall be applied "solely" to the support of the institution; and the institution being forbidden to charge tuition for its support; the contract of exemption covers its endowment lands and rented out lands; and is not to be confined merely to the college building. (Henderson, Ky., v. Strangers Rest, 17 Southwestern Reporter, 215; Asylum v. New Orleans, 105 U. S., 365; Northwestern University v. People, 99 U. S., 323; Washington University v. Rouse, 8 Wallace, 439; Nazareth Institute v. Commonwealth, 14 Ben. Mon., 266; Farmers Bank v. Commonwealth, 6 Bush, 127; University of the South v. Skidmore, 87 Tennessee, 162; Book Agents Methodist Church v. Hinton, 92 Tennessee, 200; Willard v. Pike, 59 Vermont, 202; Griswold College v. State, 26 American Reports, 138; State v. Ross, 4 Zabriskie, 497; Nelson v. Stryker Seminary, 52 Minn., 142; Orphans v. Collector, 37 La. Ann., 68; Hardy v. Latham (Harvard College), 7 Pickering, 108; New Orleans v. Poydras Asylum, 33 La. Ann., 850.)

5. The contract of exemption was not forbidden by the provision of the Kentucky Constitution of 1849, that "when they form a social compact" "all freemen are equal" and "no, man or set of men are entitled to separate exclusive public emoluments or privileges from the community, but in consideration of public services." The exemption of the property of this institution was not given as a mere "privilege," but was contracted for; and for the valuable consideration of free tuition and other burdens undertaken by it. (Williams v. Cammack, 61 American Decisions, 513; Commonwealth v. Whipps, 80 Ky., 272.)

6. As the entire property of the seminary was devoted to the charitable cause of free education, and not to private profit; it performed a public service in the meaning of the Constitution. (Zable v. Baptist Orphans' Home, 92 Ky., 91; Washington University v. Rouse, 8 Wallace, 439; Nazareth College v. Commonwealth, 14 Ben. Mon., 266; Barbour v. Board Trade, 82 Ky., 655, 656, 664; Com. v. Louisville, 1 Duvall, 298; Com. v. Masonic Temple, 87 Ky., 353; Lancaster v. Clayton, 86 Ky., 376; Clark v. Water Co., 90 Ky., 525; Henderson v. McCulloch, 89 Ky., 452; Higgins v. Prater, 91 Ky., 6; Cooley on Taxation, 2d edition, 119, 202; Willard v. Pike, 59 Vt., 202; Cooley's Const. Lim., 6th edition, 632; Desty on Taxation, Vol. 1, 116.)

7. But even under the new Constitution (Sec. 170), and the new exemption statute of 1892 (Ky. Statutes, Sec. 4026), the property,

including the endowment, of this seminary would be exempt; because it is an educational institution of purely public charity, not operated for gain, with its income devoted solely to the cause of education. (Protestant Episcopal Academy v. Taylor, 150 Pa. St., 565.)

8. The exemption of institutions of purely public charity and institutions of education, is an exemption, not of the mere college or hospital building, but of the institution itself. The charitable institution, as a corporate being, is not to be called on to pay taxes. (State v. Hamline University, 46 Minnesota, 316; Humphries v. Little Sisters of the Poor, 29 Ohio State, 201; Gerke v. Purcell, Archbishop, 25 Ohio St. 229.)

9. The long-settled policy in Kentucky (as in all other English speaking States and countries) being not to tax the property of charitable educational institutions, a revolutionary change in that policy, without any apparent cause, will not be presumed as intended by the new Constitution; nor will it be so construed, unless the language unmistakably shows such purpose. (Endlich on Construction of Statutes, sections 378, 381, 530, 531; Lee v. Forman, 3 Met., 116; Johnson v. Offutt, 4 Met., 21; U. S. v. Ryder, 110 U. S., 739-740; Higgins v. Prater, 91 Ky., 18.)

10. The policy of exempting such educational institutions, operated not for private gain, extends back to the statutes of mortmain. (Attorney-General v. Tancred, Amblers R., 352); the Elizabeth Statute of Charities (Story's Eq. Jur., Sec. 1160); the Ordinance of 1787 (52 Minn., 144); the founding of Harvard College (7 Pickering, 108); Yale College (59 Conn., 163); Princeton University (4 Zabriskie, 497); and the other English and American seminaries. And the same policy has always prevailed in Kentucky (Nazareth College v. Com., 14 Ben. Mon., 266; Zabel v. Baptist Home, 92 Ky., 91; Higgins v. Prater, 91 Ky., 18.)

11. The debates on the new Kentucky Constitution show that the intention was to exempt all of the property of charitable educational institutions, not operated for private gain. (Constitutional Debates, pages 2372, 2376, 2541, 2553, 2499, 2500, 2562, 2710, 2711, 2712, 2735.)

12. "The framers of it (the Kentucky Constitution) and the people adopting it, were moved, not by a fear of too much education, but of too little" (Higgins v. Prater, 91 Ky., 18); and they feared that as to a free charitable educational institution, earning nothing with which to pay taxes, "Taxation may be a worm at the root, which, in its consequences, may destroy both root and branch." (Atwater v. Woodbridge, 6 Conn., 223.)

City of Louisville v. Southern Baptist Theological Seminary.

J. S. WORTHAM FOR CLAGGETT, SHERIFF.

1. The lands of the Southern Baptist Theological Seminary, located in Grayson county, are not part of the "institution." Such farms, the products of which are used for the support of the school, are not exempt, if the "institution" is. The exempted property is that actually used by the institution for its educational or charitable purposes. (St. Edward's College v. Morris, 82 Texas, 1; Thiel College v. Mercer County, 101 Pa. St., 530.)

2. No duty is imposed upon the State to prepare persons for the ministry, and therefore appellee can not render such a "public" service," by granting free tuition to persons of all denominations studying for the ministry. It rendered no such public service as gave the Legislature the right or power to exempt it from taxation. (Com. v. McKibben, 12 Ky. Law Rep., 474; Barbour v, Board of Trade, 82 Ky., 645; Clark, Sheriff, v. Water Co., 90 Ky.,525 ; Nazareth Academy v. Com., 14 B. M., 266; Com. v. Masonic Temple, 87 Ky., 349.)

THOS. H. HINES OF COUNSEL FOR CLAGGETT, SHERIFF.

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT:

The question involved here is the right of the city of Louisville and the State to impose a tax on the lands of the Southern Baptist Theological Seminary, an institution of learning, located at Louisville and owning lands and property not in actual use for teaching, and some of which is situated in a distant county. By its act of incorporation in 1876 the seminary was entitled to hold its property, of whatever kind it might own, "exempt from any taxes or assessments of whatever kind, whether State, county, municipal or otherwise," provided the amount should never exceed $2,000,000, and provided the income from rents, profits, dividends and other annual proceeds of the estate, funds and investments of the corporation, after payment of current expenses, should be expended for the annual

support and maintenance of the institution. By an amendment to its charter it was provided that the seminary should have an endowment fund, and by a subsequent amendment (April 19, 1884), it was provided that the exemptions contained in the original charter should "continue in force so long as said seminary shall not make any charge for tuition to persons of any denomination of Christians studying or preparing for the ministry, and any law allowing a repeal or limitation of such exemption is hereby repealed so far as said act is concerned." (Acts 1883-4, volume 2, page 267.)

It appears from the petitions filed to enjoin the collection of the tax that the object of the institution was to furnish free of charge educational facilities to young men studying or preparing for the Christian ministry, refusing none from any denomination; and, as its entire property is devoted to the cause of charity and education, it is contended that the institution is exempt from taxation under section 170 of the Constitution and by its charter contract as well.

With respect to its first contention it is reasonably clear that the principles announced in the Kentucky Female Orphan School case just decided are conclusive, and need not be repeated here. The work of the institution is confessedly a pure charity, and we think it is no less a public one. It is free to all, and while under denominational control, so are nearly all successful seats of learning, and this fact has never been held to affect the nature of the charity.

The peculiar tenets of this denomination are doubt-
less taught, but a belief of them is not required, and is
not made the test of admission.    The course of study
is not set out in the pleadings, but a systematic course
of religious instruction must surely embrace much
that promotes morality and good citizenship.    A reli-
gion that does not inculcate obedience to the laws of
the land and instill into the pupil's mind lessons of pa-
triotism and love of country is a hollow mockery. The
high standing of this institution leaves no room to
doubt its usefulness to the State.    It performs a "pub-
lic service" in the very best sense of the word.

In Academy, &c., v. Taylor, &c., 150 Pa. St., 565, the
language to be construed was "institutions of purely
public charity," and it was said "the fact that the
school is under the control of a denomination or of a
religious sect, and that a preference is given to the
children of parents connected with the denomination,
does not destroy its character as a public charity; since
no one is excluded by reason of denominational con-
nection or preference, but such persons are admitted
as fast as vacancies occur."

It seems clear to us that the charity administered
by this institution is purely public, though the man-
agement and organization are private and denomina-
tional.    We are of opinion that both under the con-
stitutional enactment and in virtue of its charter pro-
visions the institution is exempt.

Wherefore, the judgment in the first-named appeal

is affirmed and in the second reversed for proceedings consistent herewith.

AFTER THE RE-ARGUMENT, JUDGE DURELLE DELIVERED THE FOLLOW-ING DISSENTING OPINION, IN WHICH JUDGES GUFFY AND WHITE CON-CURRED:

Upon the question of the exemption claimed under the clause of section 170 exempting "institutions of education not used or employed for gain by any person or corporation, and the income of which is devoted solely to the cause of education," our views have been stated in the dissenting opinion filed to-day in the cases of Trustees of Female Orphan School v. Louisville, &c., so far as that claim is based on the construction of the word "institution" as meaning corporation. We are further of opinion that the kind of education given at this seminary does not bring it within the meaning of section 170 of the Constitution, it being purely sectarian and not general education and devoted entirely to the propagation of the doctrines of a sect. It is not a purely public charity, if a charity at all, as the nature of the instruction given forbids any but professors of that religion receiving it, and by its charter it is not required to be free to any but Christians. Being created solely for the purpose of giving religious instruction and spreading the tenets of a particular religion, it would seem to fall within the meaning of sections 3 and 5 of the Constitution.

The general doctrine as to religious instruction is thus stated by Judge Cooley: "This to the individual is an object of the very highest moment, and formerly

it was thought to be the duty of government to provide for it. The more enlightened opinion of the present day denies the duty, and affirms that anything in that direction is in greater or less degree a species of persecution of those whose views are not favored, and, therefore, incompetent in any country whose political institutions are based upon the principles of equality before the law. Religious instruction is, therefore, by common consent referred exclusively to the voluntary action of the people." Cooley on Taxation, 118.

It is to be observed that under section 170 institutions of purely public charity and institutions of education have been separated into two classes, indicating an intention that those institutions which belonged to one class were to be excluded from the other. Two separate classes having been established, it may be doubted whether an institution falling properly within the description of one class can be exempted from taxation as belonging to the other. But, be that as it may, we are of opinion that this appellee does not belong to either class. What in our view is the correct doctrine as to institutions of purely public charity has been well stated in a recent case:

"There is nothing of doubt in this case, except the question as to whether the appellee is an institution of 'purely public charity,' within the meaning of section 1, article 9, of the Constitution of 1874. If it be not, nothing in its charter or the statutes can avail to exempt it from liability to taxation.

"The contention turns on the constructional meaning of the words 'purely public charity.'

"The legal definition of the word charity has been the subject of much discussion in the courts, especially in those of England, but its meaning here, discarding all technical sense, is a 'gift to promote the welfare of others.' The appellee is clearly a charity. It provides for and maintains in the 'Masonic Home' indigent, afflicted and aged Free Masons. This, too, from voluntary contributions, without charge to the beneficiaries, and with no profit either to the corporation or its officers. Not one of the corporate officers receives a cent of compensation for administering its affairs. Such unselfishness excites the admiration and approval of all friends of humanity.

"Gen. Wagner, the president of the institution, testifies: 'The number of inmates at present is thirty. Their average age is seventy-two years. All are decrepit. If they could support themselves they would not be admitted. The money to support them is contributed by different Masonic lodges, individuals, Masons, men and women. The receipts are always less than the expenses, and a deficit has to be made up at the end of each year. No one is benefitted except the inmates. They are fed, clothed and lodged during life, and buried at death at the expense of the Home.'

"Of course, if this be not purely charity, nothing is. But is it a public charity? The word public relates to or affects the whole people of a nation or State * * * But then, to exclude every other idea of public, as distinguished from private, the word 'purely' is prefixed by the Constitution. This is to intensify the word

'public,' not the word 'charity.'   It must be purely pub-
lic; that is,. there must be no admixture of any qualifi-
cation for admission heterogeneous and not solely re-
lating to the public.   That the appellee is wholly with-
out profit or gain only shows that it is purely a charity,
and not that it is a purely public charity.   Nor does
the argument, that to the extent it benefits Masons, it
necessarily relieves the public burden, offset the ques-
tion.   This is not a question to be decided on senti-
ment.   If it were, our inclinations would prompt to a
different conclusion.   But there is not much sentiment
in the Constitution.   It is a barrier erected by the
whole people against encroachments on the rights of
the people as a whole.   They have forbidden an an-
nual appropriation of their money in a sum equal to the
amount of taxes here imposed for the benefit of a fa-
vored few.   The duty of a court, when called upon to
decide such a question, is so plain that 'he who runs
may read.' "   Philadelphia v. Masonic Home of Phil-
adelphia, 160 Pa., 572 and 23 L. R. A., 545.

The claim of contract exemption, we need not stop
to discuss.   Whether free tuition to Christians was a
real consideration for an exemption, or a clumsy device
to evade the provisions of the act of 1856 need not be
here considered.   It is sufficient to say here that if
the appellee has a contract exemption from taxation,
the case should be decided upon that ground, and not
upon a theory which is subversive of one of the main
purposes of the constitution, and which in practical
application will result disastrously not merely to the

people whose burdens are increased, but to the very corporations in whose favor it is urged.