## Broadway & Fourth Avenue Realty Co. v. City of Louisville.

October 29, 1946.

Woodward, Dawson, Hobson & Fulton for appellant.
Gilbert Burnett and Alex P. Humphrey for appellee.

OPINION OF THE COURT BY JUDGE SILER—Affirming.

This was an action involving the right of the City of Louisville, appellee, to collect taxes on buildings erected by Broadway and Fourth Avenue Realty Company, appellant, upon land leased to the latter by Southern Baptist Theological Seminary under a 99 year lease.

The chancellor adjudged that the buildings on the leasehold belonged to the realty company, a legal taxpayer, rather than to the seminary, a tax exempt educational institution, and that the appellee had a right to collect taxes on such buildings. The realty company has appealed.

The only question before us is that of the legal propriety of the chancellor's judgment. And the answer to that question must come from a determination of the ownership of the subject buildings. Do they belong to the lessor, the tax exempt seminary, or do they belong, for tax purposes, to the lessee, a tax paying corporation engaged in the real estate business? This is a question of law. There is no issue of disputed fact in this case.

Nearly 50 years ago this court decided that this particular seminary was a tax exempt educational institution within the meaning and purpose of section 170, Kentucky Constitution. City of Louisville v. Southern Baptist Theological Seminary, 100 Ky. 506, 36 S. W. 995. But the immediate question at hand is not one involving the classification of an institution, but rather it is one involving ownership of property for taxation purposes.

The seminary occupied valuable real estate at and about the location of Fifth and Broadway in Louisville before its operations were moved to the eastern edge of the city some years ago. In 1927 the seminary leased this downtown property to J. Graham Brown for a 99 year term, from January 1, 1928, until December 31, 2027. Brown assigned this lease to the appellant realty company, which erected substantial buildings, consisting of the Greyhound Bus Terminal and the Brown Garage, on the leased land. The lease contract is 46 pages long and this opinion should not be burdened with its full length recital.

Some of the salient and pertinent provisions of the lease are: That the agreement between the parties was denominated "indenture and lease;" that the improvements to be built on the land were to become the property of the seminary as erected, possession of same to be surrendered upon termination of the lease; that the improvements were to cost $350,000 and were to be completed within 12 years; that the rent was to begin at $37,-500 annually and was to increase each decade until it reached $70,000 annually during the 5th decade; that the rent for the last half of the tenure was to be fixed by arbitrators on a basis of 5% of the land valuation, not including improvements, as such land might be appraised at the beginning of the last half of the tenure; that the lessee had the right to remove buildings during the tenure, but only on the condition that the equivalent value of the removed buildings be first deposited with a trustee as a guarantee of their replacement; that in the event of a condemnation of the leased property, the compensation for the land should go to the lessor and the compensation for the buildings should go to the lessee; that the lessor should have a lien on the buildings to secure payment of rent; that the lessee should pay taxes lawfully assessed against the land and improvements covered by the lease.

In 1939 an amendment was made to the original contract. The rent was reduced by the amendment and provision was made for a continuation of a lower rent scale on the condition that certain improvements be made on the leasehold within a fixed time. The amendment further provided that the lessor should also have, as additional rent, one-third of the net profit to be derived from the operation of the leased property.

Sometime after it had erected the bus terminal building, the appellant realty company made a lease of this building to the Greyhound interests in a contract in which the appellant realty company was referred to as the "landlord," that is by such an appellation as might indicate within itself a proprietary interest in both the land and the building covered by the sublease.

Such are the undisputed facts, in general substance, as they appear in the pleadings and in the lease itself.

For many years the courts held firmly to the concept

that anything attached to land was an unalterable part of the land. But this concept has now become somewhat modified and modernized with the changed conditions of a Twentieth Century civilization. The owner of the dirt beneath an embedded fixture, placed there by his tenant, does not necessarily own the fixture itself. See the case of Bank of Shelbyville v. Hartford, 268 Ky. 135, 104 S. W. 2d 217.

Our own legislative body has taken recognition of the practical possibility of separating the ownership of a piece of soil from the ownership of its improvements for purpose of taxation, having said by statutory enactment that a tenant's improvements on land may be assessed in his name apart from the land. See KRS 91.310.

Although appellant's contract provided that the lessor should own the subject buildings as erected and should have them in actual possession in the year 2027, yet we must not become entangled in the skillfully drawn verbal web of language employed in the formation of this lease and neglect the broad spirit and the general operative purpose of this transaction, as interpreted from this covenant as a whole. Looking at all parts of this 99 year lease and considering it in a practical way, as we must for taxation purposes, the bus terminal and garage in question are not things of seminary ownership. They are alienated from seminary domination and control during the next 81 years. They could not be sold by the seminary for anything like a substantial market value at the present time or during the next generation. Under the variable conditions of the relentless and marching years, the subject buildings may never reach the authoritative possession of the seminary with anything like their present state of valued and respected quality.

It is a rightful thing to exempt religious, educational and charitable organizations from the necessity of paying taxes on their very own property. But a rather strict interpretation of what they own seems justified. And it is proper to say that many of them could not conveniently exist as going concerns without the protections and benefits thrown about them by our tax supported city, county, state and federal governments. It will not do to encroach too far upon the vested bene-

volence of section 170 of the Kentucky Constitution. Christ himself recognized the authority and value and necessity of tax supported government when He said, "Render therefore unto Caesar the things which are Caesar's." Heavy tax burdens must be carried by the general public, and there is, generally speaking, no lack of willingness to carry them without the aid of our religious, educational and charitable institutions. But, on the other hand, it must be recognized that there are definite and reasonable limits of the ordained magnanimity abounding in our constitutional law.

In a recent opinion of this court, we refused to consider a piece of property located just one block from the property in the instant case to be tax exempt. In that case the property, located at Sixth and Broadway, was nominally owned by a Methodist organization. But the equitable and beneficial ownership had been transferred to a certain individual for commercial purposes by means of a contract that was called a lease. This court looked through the mists of rhetoric in that transaction and held that the broad aim of the parties was to transfer the practical ownership of the property from lessor to lessee. We held that the property was subject to taxation. See the case of Trinity Temple Charities, Inc. v. City of Louisville, 300 Ky. 172, 188 S. W. 2d 91. It can be readily foreseen that tax exempt organizations might be extensively used by commercial organizations to evade payment of taxes on real estate improvements through the medium of long term leases, if we should deny the right of a taxing authority to make separate assessments of buildings and of lands in cases of this kind.

Other jurisdictions have likewise adopted the view that ownership of buildings erected by tenants on land leased to them under long term contracts may be vested in those tenants or lessees and that such buildings may be subject to taxation even though the landlords, lessors or owners of the legal titles to the underlying lands are unquestionably exempted by law from paying any taxes whatever. Central Coal & Lbr. Co. v. Board of Equalization, 70 Okl. 131, 173 P. 442; United States v. Erie County, D. C., 31 F. Supp. 57; Outer Harbor, etc., Co. v. Los Angeles, 47 Cal. App. 194, 193 P. 142. This Court considers the viewpoint sound that a tenant's

permanent improvement, standing on his 99 year lease and erected by the tenant at his own expense but called the property of the landlord in a contract between them, may well be a legal subject of taxation as the tenant's own property. This is reasonable and sensible. This is to the ultimate best interest of all the people, including our group of great and vital tax exempt institutions and also the other group which sustains the colonnades of free government by regularly "rendering unto Caesar the things which are Caesar's" through that inevitable and somewhat burdensome thing called taxation, often described as certain like death.

As to the contractual rights of property between the seminary and its lessee, this decision has no binding effect whatever, since this is only an interpretation as to the practical ownership of the leasehold buildings for taxation purposes, none other.

Wherefore, seeing no error in the chancellor's judgment, the same is now hereby affirmed.

Judge Dawson not sitting.