**ARCÀDIA REALTY FOUNDATION, INC.,
et al., Appellants,**

v.

**Nat HOENIG et al., Appellees.**

Court of Appeals of Kentucky.

Nov. 13, 1959.

As Modified on Denial of Rehearing
June 24, 1960.

S. L. Greenebaum, Greenebaum, Barnett & Wood, Squire R. Ogden, Louisville, for appellants.

William E. Scent, J. W. Jones, Frances M. Thompson, Louisville, William S. Riley, Frankfort, William T. Baskett, Louisville, for appellees.

SANDIDGE, Judge.

Appellants, Arcadia Realty Foundation, Inc., Walton Realty Foundation, Inc., and Gileen Realty Foundation, Inc., instituted this action against appellees, members of the Board of Tax Supervisors of Jefferson County for 1956, Tax Commissioner and County Judge of said County, Department of Revenue and Commissioner of Revenue of the Commonwealth, Director of Finance for the City of Louisville, and Superintendent of Public Instruction of said city, for a declaratory adjudication that three housing projects owned by appellants in Louisville were on January 1, 1956, exempt under § 170 of the Constitution of Kentucky from ad valorem taxation. This appeal is from a judgment that such properties were not exempt, and the following facts are presented.

Pursuant to and in conformity with the National Housing Act, 12 U.S.C.A. § 1701 et seq., H. G. Whittenberg, a Louisville contractor, and members of his family organized three private corporations in 1950, under Chapter 271 of Kentucky Revised Statutes, named Arcadia Realty Company, Walton Realty Company and Gileen Realty Company. These corporations were empowered to procure contracts of mortgage insurance under the provisions of said Act, to obtain construction loans from financial institutions by virtue of contracts of mortgage insurance, to apply the proceeds of such loans to constructing and furnishing rental housing projects, and to operate them. The Whittenbergs subscribed for the common stock of the corporations and, pursuant to the requirements of the Act, preferred stock therein was issued to the Federal Housing Commissioner. As a preferred stockholder the Commissioner controlled the rental schedules of the corporations and exercised broad powers which are ordinarily vested in the officers, directors, and stockholders of private corporations. The rental schedules were to be determined by FHA formula designed to secure rentals sufficient to pay mortgage principal and interest; to meet operating expenses, including taxes; and to provide reserves for depreciation and replacement of refrigerators, stoves, water heaters, etc., in the buildings. In short, there was little, if anything, that the corporations could do in connection with the management and operation of the proposed projects without the consent and approval of the Commissioner. Such organizations are commonly known in financial circles as "FHA corporations."

The Whittenbergs subscribed for common stock of the par value of $52,300 in the corporations, but later by amendment to their Articles they had the par value of such stock reduced from $100 to $10 per share, and actually paid to the corporations a total of $5,230 for such stock.

Certain lots of land upon which the proposed projects were to be constructed were conveyed to the respective corporations by deeds dated June 9, 1950.

On June 20, 1950, the three corporations obtained separate loans which aggregated the sum of $2,419,200 from the First National Bank of Louisville, evidenced by their separate notes bearing interest at 4%, and secured by mortgages on the lots that had been conveyed to them. The Arcadia note, with interest from its date, was payable in monthly installments of $5,749.33; the Walton note, with similar interest, was payable in monthly installments of $2,361.-33; and the Gileen note was payable, with similar interest, in monthly installments of $2,977.33. Payment of such notes was guaranteed by FHA. In 1951 the bank assigned the notes and mortgages to New England Mutual Life Insurance Company of Boston, Massachusetts.

The construction and equipment of the three projects were completed in 1951 and, strange as it may seem, the total cost thereof, including cost of the land involved, was approximately $190,000 less than the aforesaid aggregate loan obtained therefor. Such excess was not withdrawn as a builder's profit, but was retained and invested by the corporations in securities. The three housing projects were thereafter operated by the corporations under the management of their agent and employee, Robert Adelberg. Through the rental income they continued to meet the installment payments due on said loans and to set up the reserves for depreciation, etc., required by FHA. After making such current payments and setting up the reserves, the three corporations on December 29, 1955, had on hand investment securities of the value of approximately $293,000 and a cash balance of approximately $50,000, or a total of about $343,000 in uncommitted liquid assets. The balance then unpaid on the mortgages was approximately $2,258,500.

On December 29, 1955, the Whittenbergs and Georgetown College executed a writing, denominated a contract, which recited that by agreement between the parties the Whittenbergs did thereby "sell and convey" to Georgetown College all their shares of common stock in Arcadia Realty Company, Walton Realty Company and Gileen Realty Company for $934,722; that $80,000 thereof was to be paid on or before December 31, 1955; and that Georgetown College would execute a note for the remaining $854,722 of the purchase price, payable in the following manner: $232,000 on or before January 31, 1956, and the balance in monthly installments of $6,000 each, commencing on February 1, 1956, with interest thereon at 4½% per annum from their due date, with the proviso that if ad valorem taxes had to be paid on the housing projects, then the $6,000 payments would be proportionately reduced. It was further provided in the "contract" that the payment of such purchase price and note was not to be a general obligation of Georgetown College, but was to be satisfied only out of the income from the housing properties of the three corporations, subject to the prior obligations of the corporations on the mortgage notes and to the Federal Housing Commissioner.

The writing provided for Georgetown College filing amended articles of incorporation for each of the corporations, changing their names to Arcadia Realty Foundation, Inc., Walton Realty Foundation, Inc., and Gileen Realty Foundation, Inc., and changing their status to that of charitable or educational institutions under the provisions of Chapter 273 of Kentucky Revised Statutes, with authority to acquire property and to hold, maintain, improve and operate same "for the sole benefit of Georgetown College." It also provided that the amended articles would authorize the performance of all previously created obligations of the corporations to the insurance company and Federal Housing Commissioner under the provision of the National Housing Act, and that under such amended articles the Commissioner should possess the same privileges and prerogatives he previously had through the ownership of preferred stock. In addition to requiring such amended articles to preserve the status of FHA, the instrument reserved to the Whittenbergs the control over the income and operations of the corporate properties until the indebtedness to them was paid in full, by providing: (1) that the Whittenbergs could designate the manager and rental agent of the properties; (2) that all rentals and monies of the corporations were to be kept in a separate account with the Louisville Trust Company; (3) that Georgetown College could not accumulate or expend any of the monies of the corporations for its own purposes or benefit; and (4) that it was the intention of the parties that none of the receipts of the apartment projects should be mingled with other funds of Georgetown College.

Pursuant to such arrangement the common stock of the three corporations was transferred to Georgetown College; the

articles of incorporation were accordingly amended; the note, payable only out of income from the properties, was executed to the Whittenbergs; and the other provisions were fully complied with before January 1, 1956. Since then the three corporations and housing projects have been operated in conformity with the amended articles.

The lower court found that the purchase price of $934,722 for the common stock of the three corporations was fair and reasonable. We do not deem the fairness of such price material, since the price paid for corporate stock has little bearing on whether property of the corporation is exempt from taxation. The proof showed and the court found that if the housing projects are exempt from ad valorem taxes, the indebtedness and note to the Whittenbergs could probably be satisfied in full in 1965, but not sooner; that if ad valorem taxes had to be paid on the properties, said indebtedness could not be satisfied until 1977; and that there was the possibility such indebtedness might never be satisfied.

In short, we have the following situation. The bare legal title to the housing projects is in the three charitable foundations. Georgetown College is the potential beneficiary, but neither the foundations nor the College can use the properties or receive any monetary benefit from them until in 1965, perhaps not until in 1977, and possibly never. All the appellant foundations are claiming is that, in addition to the legal title, they will have an equity in the properties, which will increase each month until the indebtedness to the Whittenbergs is satisfied, and therefore the properties should be exempt from ad valorem taxation.

■ The so-called contract of December 29, 1955, was adroitly drafted and presents a complex scheme for avoiding the payment of ad valorem taxes. That is not an expression of derogation, since there is nothing improper, morally or legally, in one honestly endeavoring to protect himself from destruction by the unlimited power of taxation. However, the document must be considered from the standpoint of what it does, and not by what it is denominated. The transfer of the stock to the College could hardly be considered a "sale," because there was no personal or general obligation or liability on the part of the College to pay anything for it. The transaction in many ways resembles a gift in futuro, a gift of heavily encumbered property to become effective upon the happening of a probable event. Regardless of the verbiage in the instrument the result is that the foundations can obtain no use of or monetary benefit from the housing projects until the Whittenberg debt is paid. That is also true as to Georgetown College.

■ The contention of appellants that such properties should be exempt is predicated primarily upon the ruling in City of Louisville v. Presbyterian Orphans Home Society of Louisville, 299 Ky. 566, 186 S.W. 2d 194, which is a leading case on exemptions under § 170 of the Constitution. In the opinion therein many, if not all, of the previous cases on the subject were reviewed. The question presented was whether the income producing realty of charitable and educational institutions, consisting of office buildings, store buildings, restaurants, parking lots, etc., were exempt from ad valorem taxes under § 170 of the Constitution. It was held that all properties of such institutions, including the income therefrom, are exempt, the court saying that proper construction of § 170 required the exemption of all properties of such institutions wherever situated and in whatever form they might exist. Such language is quite broad, but we again approve it. However, it must be read and construed, as should the language in all opinions, in the light of and in connection with the facts with which the court was dealing. In the Presbyterian Orphans Home Society case, and also in the cases cited in that opinion, this court was dealing with situations where the properties involved were legally owned by charitable or educational institutions, and from which

they were presently receiving monetary income that was being used and devoted exclusively to charitable or educational purposes.

In the present case we have quite a different state of facts. Here, the bare legal title to the properties is in the appellant foundations, but they are not entitled to possession and have no control over the management or operation of the properties, and are not receiving, and have no right to receive, any of the income therefrom until the Whittenbergs are paid in full. The Whittenbergs are now receiving and will continue to receive all of such income, after deducting the mortgage installments and required reserves, for a long and indefinite period. The most the foundations now have is a potential or inchoate equity in the properties.

■■ While in the Presbyterian Orphans Home Society case it was held that all "properties" of charitable and educational institutions are exempt from taxation it is still essential to exemption that the thing in question constitute "property" of the institution. We are not aware of any case deciding that the holding of bare legal title, even accompanied with some equity, is property ownership within the meaning of Section 170 of the Kentucky Constitution. On the contrary, it has consistently been held that where all rights of *beneficial ownership* of real estate are vested in someone else the real estate constitutes "property" of such other person and is taxable, even though legal title is in a charitable or educational institution. See Broadway & Fourth Avenue Realty Co. v. City of Louisville, 303 Ky. 202, 197 S.W. 2d 238; Louisville Garage Corporation v. City of Louisville, 303 Ky. 553, 198 S.W. 2d 40; Steiden Stores v. City of Louisville, 303 Ky. 637, 198 S.W.2d 983.

■ The cases immediately above cited stand for the proposition that where a person other than the charitable or educational institution which holds bare legal title exercises complete domination and control over the real estate and receives all present benefits of ownership, he is the practical owner within the meaning of Section 170. All of these cases involved long-term leases, and in each case the equity of the title-holding institution could be considered to have been increasing as the term of the lease ran its course. In the first two cases this fact was deemed of no significance. In the Steiden Stores case, where there was a "deprivation schedule" placing a specific, gradually decreasing value on the lessee's interest for each year of the lease, it was held that the specific contract values could be given recognition and that the lessee should be held taxable in accordance with those values. However, the court stated that each contract of this kind will necessarily have to be construed separately.

■ We are not prepared to hold that in the absence of a contractual fixing of the values of the respective interests in a property there can be an apportionment of values for tax exemption purposes in situations of the kind under discussion. Such would involve speculative elements, and the rule as stated in the Steiden Stores case is that the construction of transactions of this nature should be as strict as possible to defeat tax exemption. We call attention to Trinity Temple Charities v. City of Louisville, 300 Ky. 172, 188 S.W.2d 91, where a so-called lease of real estate by a charitable institution was held to be in reality a sale, with the purchase installments spread over a period of 20 years, and it was held that the real estate was taxable to the purchaser even though the institution retained a substantial equity at the outset.

■ We do not say that a particular item of property as to which a charitable or educational institution has the rights of beneficial ownership must in fact be so used as to produce benefits for the institution in order to be exempt from taxation, but we do say that if the rights of beneficial ownership are vested in some oth-

er person who does receive the benefits the property is taxable.

█ The Whittenbergs are now, and will be until the indebtedness to them is fully paid, the beneficial owners of the property, and until such indebtedness is paid the properties will not be exempt from taxation.

The judgment is affirmed.

MONTGOMERY, Chief Justice.

The meaning and effect of Kentucky Constitution Section 170 were fully discussed in City of Louisville v. Presbyterian Orphans Home Society of Louisville, 299 Ky. 566, 186 S.W.2d 194, 199. Different types of charitable and educational institutions were involved in the nine appeals thereby decided. Judge Rees, speaking for the Court in that case, pointed out the liberal policy "long favored in this state" toward the exemptions so granted.

The basis for the tax exemption was expressed as:

"The exemption of property of charitable and educational institutions had always been favored in this state, and there is nothing in the constitutional debates tending to indicate that it was the purpose of the delegates to the convention to reverse or circumscribe the policy theretofore recognized other than to make the exemptions uniform and to limit them to institutions of purely public charity and institutions of education not used for private gain. These kinds of institutions engage in activities which relieve the state and municipalities of burdens which they otherwise would have to assume. As frequently stated by this court, both before and after the adoption of the present Constitution, they render what are properly public services, thus relieving the taxpayers of a portion of their burden and justly entitling the institutions to exemption from taxation."

This relief is recognized in the majority opinion in the instant case.

The majority opinion would distinguish the Presbyterian case from the instant case on the basis of present and future enjoyment of benefits. It is pointed out in the majority opinion, as the basis for the decision therein, that the charitable or educational institution may not receive any monetary benefit until 1965, perhaps 1977, and possibly never. This ignores the fact that the charitable institution has legal title to the property for the sole benefit of the educational institution, and that with each payment on the indebtedness, there is a corresponding increase in the institution's equity in the property whose value, so far as is shown, is convertible into cash at the present or at any future time. This is a present monetary benefit to the institution since it constitutes a progressive increase in the assets and endowment of the institution.

Returning to the purpose of the constitutional section, that is, the institutions render public service which relieve the taxpayers of a portion of their burden, by giving force to the exemption now would mean that the institution will receive a monetary benefit by 1965 which will assist in relieving the taxpayers of their burden. To hold the property taxable under the majority opinion means that such relief will be postponed until 1977. The incongruity of such a holding may be illustrated by saying that a baby is subject to the payment of taxes during the period of gestation but is exempt after birth.

In the Presbyterian case, the Court reaffirmed the definition of income and property included in the exemption, as set forth in Trustees of Kentucky Female Orphan School v. City of Louisville, 100 Ky. 470, 36 S.W. 921, 19 Ky.Law Rep. 1091, 40 L.R.A. 119, in the following language:

"The court concluded that the income of educational institutions 'devoted solely to the cause of education' means 'the income of the corporate

body' and not 'income from the buildings, grounds, etc.' The court then said: 'We think, therefore, a proper construction of the language used in the section requires the exemption of the entire property of this institution, wherever situated, and in whatever form its investments may be found.' " [299 Ky. 566, 186 S.W.2d 196.]

The latter case was decided five years after this section of the constitution was adopted. The intent of the framers was fresh in the minds of the Court at that time. The effect of the majority opinion is to circumscribe the time-honored holding in the two cases cited, and many times approved.

For these reasons, I am compelled to dissent from the opinion of my able brethren.